DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Defendant-Appellant Gayle DeRycke ("DeRycke"), as personal representative of the Estate of her late husband Douglas DeRycke ("the decedent"), has appealed from a judgment of the Summit County Court of Common Pleas that granted summary judgment to Plaintiff-Appellee Buckeye Corrugated, Inc. ("BCI"), and denyed DeRycke's cross-motion for summary judgment. This Court reverses and remands.
 I {¶ 2} At the time of his death, the decedent was an employee shareholder of BCI and president of Cra-Wal, Inc. ("Cra-Wal"), a wholly-owned subsidiary of BCI. As part of the decedent's employee benefits package, BCI purchased several life insurance policies for the decedent that allowed him to name the beneficiary of his choice. The proceeds from these life insurance policies were paid to the decedent's estate upon his death and are not the subject of this litigation. BCI also purchased additional life insurance policies ("additional policies") on behalf of decedent that named BCI as both owner and beneficiary. In its brief to the trial court, BCI stated that it retained ownership of these policies "so that in the event of the death of a shareholder employee, BCI could use the policy proceeds to fund the repurchase of the decedent's share of [BCI] stock."
 {¶ 3} While living in Indianapolis and employed by Cra-Wal, the decedent was killed in an automobile accident. BCI received $734,980 in net proceeds from the "additional policies," which insured the decedent's life. BCI viewed the net proceeds as assets of the corporation and, as a result, increased the value of all 3,305,570 outstanding shares of BCI stock proportionately. Based on this calculation, BCI paid decedent's estate $23,760 of the net proceeds. BCI referred to the net proceeds as an "increase in the `purchase price' value" of decedent's 108,000 shares of BCI stock. However, DeRycke claimed that, pursuant to the language of § 14.3(B) of BCI's Code of Regulations ("Code"), BCI should have paid her $734,980, or all of the net proceeds from the "additional policies."
 {¶ 4} Approximately one-and-a-half years after the decedent's death, DeRycke filed suit in Indiana seeking, inter alia, "a declaration from the Indiana court concerning the amount BCI must pay to repurchase [decedent's] 108,000 shares of company stock, as well as a judgment in that amount." On February 26, 2002, while the Indiana litigation was on-going, BCI filed suit against DeRycke in Summit County, Ohio. BCI asked the Summit County trial court for a declaratory judgment that the purchase price of the decedent's stock increased by $23,760 as a result of the net proceeds, rather than $734,980 as DeRycke argued. DeRycke requested a stay of the Summit County litigation pending resolution of the Indiana litigation, which the Summit County trial court denied. BCI then filed a motion for summary judgment in Summit County, to which DeRycke filed a cross-motion for summary judgment. The Summit County trial court granted BCI's motion for summary judgment and denied DeRycke's motion for the same. The Indiana trial court then granted DeRycke a stay of the Indiana litigation pending her appeal of the Summit County litigation to this Court.
 {¶ 5} DeRycke has timely appealed, asserting one assignment of error.
 II Assignment of Error
"The trial court erred in granting summary judgment in favor of BCI and denying [derycke's] cross-motion for summary judgment."
 {¶ 6} In her sole assignment of error, DeRycke has argued that the trial court abused its discretion when it granted BCI's motion for summary judgment and denied her cross-motion for summary judgment. Specifically, she has argued that the language of § 14.3 of the Code, which outlines the BCI stock repurchase provisions, is unambiguous. As a result, DeRycke has argued, the trial court inappropriately examined parol evidence when interpreting the Code and impermissibly reformed the Code. She has further argued that when appropriately applied, § 14.3 dictated that the value of the decedent's stock, when repurchased by BCI, should have been increased by $734,980, the amount of net proceeds paid to BCI from the "additional policies." We agree.
 {¶ 7} Appellate review of a lower court's entry of summary judgment is de novo, applying the same standard used by the trial court. McKay v.Cutlip (1992), 80 Ohio App.3d 487, 491. In a motion for summary judgment, the moving party initially bears the burden of informing the trial court of the basis for the motion and identifying portions of the record that demonstrate an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. Dresher v.Burt (1996), 75 Ohio St.3d 280, 292. The movant must point to some evidence in the record of the type listed in Civ.R. 56(C) in support of his motion. Id. at 293. Once this burden is satisfied, the nonmoving party has the burden, as set forth in Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id. The nonmoving party may not rest upon the mere allegations and denials in the pleadings, but instead must point to or submit some evidentiary material showing that a genuine dispute over material fact exists. Henkle v. Henkle (1991),75 Ohio App.3d 732, 735.
 {¶ 8} Pursuant to Civ.R. 56(C), summary judgment is proper if:
"(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327.
 {¶ 9} At issue in the case sub judice is the interpretation of § 14.3 of the Code, entitled "Purchase Price for Redemption or Sales Between Shareholders." In essence, this section of the Code establishes the purchase price of BCI stock when the corporation is purchasing stock either from a living shareholder or from a deceased shareholder's estate.[1]
 {¶ 10} It is well established in Ohio that the relationship between a corporation and its stockholders is contractual in nature. Geiger v.American Seeding (1931), 124 Ohio St. 222. This contractual relationship includes the corporation's bylaws, rules, and regulations. See HermitageClub Co., Inc. v. Powers (1995), 107 Ohio App.3d 321, 326 appeal denied (1996), 75 Ohio St.3d 1477. Because the Code is the embodiment of BCI's rules and regulations, the Code has all the force of a contract between BCI and its shareholders as well as relations between and among the shareholders themselves. See State ex rel. Schwab v. Price (1929),121 Ohio St. 114, paragraph 3 of the syllabus. Furthermore, because the Code is a contract between BCI and its shareholders, "the interpretation and construction of [it] is a matter of law, reserved to the court."Deken v. MacGregor (July 3, 1991), 9th Dist. No. 14958, at 7; Latina v.Woodpath Development Co. (1991), 57 Ohio St.3d 212, 214. Questions of law are reviewed by this Court de novo, with no deference given to the trial court's finding of fact. Nationwide Mutl. Fire Ins. Co. v. Guman Bros.Farm (1995), 73 Ohio St.3d 107, 108, citing Ohio Bell Tel. Co. v. Pub.Util. Comm. (1992), 64 Ohio St.3d 145, 147. Therefore, this Court will give no deference to the trial court's findings regarding § 14.3.
 {¶ 11} Section 14.3(A) of the Code states, in pertinent part:
"Except as otherwise provided herein, the purchase price to be paid by the Corporation or other Shareholders for any share of the Corporation to be purchased hereunder shall be the value thereof as of the end of the fiscal year immediately preceding the date of the offer to sell referred to in Section 14.1(A)(5), (6) or (7) as determined by majority vote of the Shareholders at the Annual Meeting of the Shareholders each year based upon a valuation report on the Corporation's shares as of such preceding fiscal year-end prepared by an independent appraisal firm chosen by the Board of Directors ("Valuation Report"). * * * Notwithstanding the foregoing provisions of this Section 14.3(A), at any time during which the [Employee Stock Ownership Plan], as the same may be amended from time to time, remains in existence and has not been terminated, the value of the shares of the Corporation for purposes of this Section 14.3 shall be the value as determined by the most recent annual (or more frequent) independent appraisal required to be conducted on behalf of the ESOP or for use for ESOP purposes. Where such an independent appraisal is performed, all references to the Valuation Report shall be deemed to mean such appraisal."
 {¶ 12} In their briefs, DeRycke and BCI have agreed that § 14.3(A) establishes that the purchase price to be paid by the corporation or other shareholders for any individual share of stock is determined by the last Valuation Report.
 {¶ 13} Section 14.3(B) of the Code states in pertinent part:
"If a share is purchased hereunder from a Shareholder who is deceased * * * and the Corporation owned a life insurance policy on the life of the Shareholder * * * the purchase price otherwise payable for such shares pursuant to the preceding provision of this Section 14.3 shall be increased by the difference between the amount of life insurance proceeds payable to the Corporation on account of the death of such Shareholder * * *, and the value of such policy on the books of the Corporation as of the end of the fiscal year as of which the value of the shares was determined."
 {¶ 14} DeRycke has argued that § 14.3(B) the Code is unambiguous and required that the repurchase price of the decedent's stock should have been increased by the amount of net proceeds received by BCI from the "additional policies" owned by BCI. Thus far, BCI has paid DeRycke $941,760 for the repurchase of decedent's stock, and she has claimed entitlement to an additional $711,220.[2]
 {¶ 15} BCI has argued that § 14.3 is not an insurance benefits provision, but rather a stock valuation provision that dictates how the value of all outstanding BCI stock will be impacted when the company receives proceeds from "additional policies" it has purchased and owns on the life of a shareholder such as the decedent. BCI has claimed it has no further financial obligation to DeRycke.[3]
 {¶ 16} This Court finds that several fundamental rules of contract interpretation can resolve the issues present in the instant matter. In the absence of any ambiguities, the words of a contract must be given their plain and ordinary meaning. Olmstead v. Lumbermens Mutl. Ins. Co.
(1970), 22 Ohio St.2d 212. "When parties to a contract dispute the meaning of the contract language, the court must first look to the four corners of the document to determine whether ambiguity exists." Ryan v.Ryan (Oct. 27, 1999), 9th Dist. No. 19347, at page 3. The trial court is given great latitude in determining the meaning of ambiguous terms, including the intent of the parties and the equities involved. In reDissolution of Marriage of Seders (1987), 42 Ohio App.3d 155, 156. However, the trial court must remain true to the guiding principle of contract interpretation: "[I]f the contract terms are clear and precise, the contract is not ambiguous and the trial court is not permitted to refer to any evidence outside of the contract itself, including the purported intentions of the parties." Ryan, supra, at 4; see, also, Lawlerv. Burt (1857), 7 Ohio St. 340, 350-351.
 {¶ 17} Based on the above cited principles of contract law, we find that the Code was unambiguous. The language included in the Code, and excluded from the Code, can guide this Court to no other conclusion. Section 14.3(A) unambiguously states that the purchase price of BCI stock, when being purchased by the corporation or another shareholder, is the value of the stock as determined by a majority vote of the shareholders at the company's annual meeting based on the Valuation Report. Section 14.3(B) clearly states that "the purchase price otherwise payable[,]" meaning payable under § 14.3(A), "for such shares[,]" meaning shares being purchased under § 14.3(A) and in this case the decedent's 108,000 shares, "shall be increased by[,]" meaning paid to the estate in addition to the § 14.3(A) price, the net proceeds from the additional policies. Nowhere in § 14.3(B) of the Code is there any mention or inference that the net proceeds from the "additional policies" should be distributed equally among all of the outstanding shares of the company as BCI has argued. In support of this argument, BCI has argued that the additional policies are "key man" policies. However, nowhere in the Code is such terminology used. Therefore, this Court finds no support for BCI's interpretation of § 14.3.
 {¶ 18} Furthermore, we find that applying the plain meaning of the words used by the drafter of the Code does not create a conflict between § 14.3(A) and § 14.3(B). If the decedent were still living and wished to sell his stock to the corporation, valuation of his stock would fall under the provisions of § 14.3(A). But § 14.3(B) includes the unambiguous triggering language of: "If a share is purchased hereunder from a [s]hareholder who is deceased[,]" and "the [c]orporation owned a life insurance policy on the life of the [s]hareholder." When these requirements of § 14.3(B) are met, the Code clearly states that the purchase price of the stock "otherwise payable," meaning payable under § 14.3(A), increases by the net proceeds paid to BCI from insurance policies it owned that insured the life of the deceased shareholder. The repurchase of BCI stock that was owned by a now deceased shareholder is a two step process. Section 14.3(A) is step one: valuation. Section 14.3(B) is step two: an add-on valuation when BCI receives funds from an insurance policy owned by BCI that insured the life of the deceased shareholder. When § 14.3(B) is read in context with § 14.3(A), it is clear that each section applies to a distinct situation. Section 14.3(A) controls the final price when BCI is purchasing stock from a living shareholder. However, § 14.3(B) controls the final price when BCI is purchasing stock from a deceased shareholder's estate. Sections 14.3(A) and (B) are clearly not in discord; they are merely two separate steps in the valuation process.[4]
 {¶ 19} Because the Code was an unambiguous contract between BCI and the decedent, "the language of the contract controls and intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." Integrity Tech. Servs. v. Holland Mgmt., 2002 Ohio 5258, at ¶ 18. The trial court committed an abuse of discretion when it admitted into evidence affidavits from Attorney Robert Malone and BCI shareholders that spoke to the intent of the parties when they were drafting the Code, then used these affidavit's to reform the plain and unambiguous terms of the Code. This Court has consistently held that a party to a contract may not be excused from its contractual obligations or repudiate a contract merely because it changed its mind or became dissatisfied with its bargain. Inchaurregui v. Ford Motor Co.
(June 7, 2000), 9th Dist. 98CA007187, at 8, appeal not allowed (2000),90 Ohio St.3d 1431, quoting Fairway Assoc. v. Lesnick (Apr. 16, 1997), 9th Dist. No. 17840, appeal not allowed (1997), 79 Ohio St.3d 1485. BCI was clearly dissatisfied with the terms of the contract once DeRycke attempted to enforce it, and it subsequently asked for and received reformation from the trial court. But the time to reform an unambiguous contract, such as the one sub judice, is before enforcement, not after. Consequently, the clear and unambiguous terms of the Code dictate that the price of the decedent's stock should have been increased by the amount of net proceeds paid to BCI from the "additional policies."
 {¶ 20} In sum, we find that the trial court erred when it granted summary judgment in favor of BCI. This Court finds there is no genuine issue of material fact in the case at bar because the terms of the Code are clear and unambiguous. Therefore, DeRycke's motion for summary judgment should have been granted by the trial court and judgment entered on her behalf. That said, BCI owes DeRycke an additional $711,220 for the repurchase of the decedent's BCI stock. DeRycke asked for and is entitled to prejudgment interest pursuant to R.C. 1343.03(A). However, "the prejudgment interest starting date remains within the discretion of the trial court." Hutchinson v. State Auto Ins. Co. (Jan. 30, 2002), 9th Dist. No. 20636, at page 4. As a result, this Court will not determine the monetary amount BCI owes to DeRycke for prejudgment interest or start date of the prejudgment interest period. We will leave resolution of this issue in the sound discretion of the trial court. Appellant's assignment of error is well taken.
 III {¶ 21} DeRycke's assignment of error is sustained. The judgment of the trial court is reversed and the cause remanded with instructions that DeRycke's motion for summary judgment be granted and prejudgment interest awarded to her in accord with R.C. 1343.03(A).
Judgment reversed, cause remanded.
BATCHELDER, J. concurs.
[1] The Code states that the add-on valuation calculation applies to a "[q]ualified [t]rust if the [g]rantor thereof is deceased" as well as a transaction involving stock formerly owned by a deceased shareholder. Because there was no trust at issue in the case sub judice, this Court will refer to the Code in the context of its application to the repurchase of company stock from the estate of a deceased shareholder.
[2] This Court has conducted its own calculation based on the facts presented in the record and finds that the following computation is consistent with DeRycke's arguments:

 Shares owned by decedent: 108,000
 Per share value based on § 14.3(A): × $8.50
 _________________________________________________
 Stock value due DeRycke: ($918,000)
 Proceeds from "additional policies:" $769,544
 Cash surrender value of above policies: -$34,980
 _________________________________________________
 Net proceeds due DeRycke: ($734,980)
 Stock value due DeRycke per § 14.3(A): $918,000
 Net proceeds due DeRycke: + $734,980
 _________________________________________________
 Total amount due DeRycke: ($1,652,980)
 Total amount due DeRycke: $1,652,980
 Payments made to DeRycke by BCI: — $941,760
 _________________________________________________
 DeRycke's claim against BCI: ($711,220)
[3] This Court has conducted its own calculation based on the facts presented in the record and finds that the following computation is consistent with BCI's arguments:
 Shares owned by decedent: 108,000
 Per share value based on § 14.3(A): × $8.50
 _________________________________________________
 Stock value due DeRycke: ($918,000)
 Proceeds from "additional policies:" $769,544
 Cash surrender value of above policy: — $34,980
 _________________________________________________
 Net increase in value of BCI: $734,980
 Net increase in value of BCI: $734,980
 Total outstanding shares of BCI: ÷ 3,305,570
 _________________________________________________
 Increased value of each BCI share: $.22
 Shares owned by decedent: 108,000
 Increased value of each BCI share: × $.22
 _________________________________________________
 Increased value of BCI due DeRycke: $23,760
 Value of BCI Stock due DeRycke: $918,000
 Increased value of BCI due DeRycke: + $23,760
 _________________________________________________
 Total amount due DeRycke: $941,760
 Total amount due DeRycke: $941,760
 Payments made to DeRycke: $941,760
 _________________________________________________
 Balance due DeRycke: 0
[4] BCI has argued that § 14.3(A) and (B) directly conflict with § 14.4, therefore rendering them ambiguous and subject to reformation using parol evidence. Having reviewed those sections, we find no inconsistency between them. That said, we reject BCI's argument with regard to this issue.