BEASLEY, Dir., Appellant,

v.

MONOKO, INC., et al., Appellees.

[Cite as *Beasley v. Monoko, Inc.*, 195 Ohio App.3d 93, 2011-Ohio-3995.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–1074.

Decided Aug. 11, 2011.

94

Michael DeWine, Attorney General, and Jeffrey L. Maloon, Assistant Attorney General, for appellant.

Schottenstein Zox & Dunn Co., L.P.A., Roger L. Sabo, and Jeremy M. Grayem, for appellees.

---

CONNOR, Judge.

{¶ 1} Plaintiff-appellant, James Beasley, Director of the Ohio Department of Transportation ("ODOT" or "appellant"), appeals from a judgment entered in the Court of Claims of Ohio granting summary judgment in favor of defendants-appellees Monoko, Inc. and Peerless Insurance Company (collectively, "appellees") and denying appellant's cross-motion for summary judgment. For the following reasons, we affirm the judgment of the Court of Claims of Ohio.

## I. Facts and Procedural History

{¶ 2} This action involves a contract for painting four bridges located in Guernsey County, Ohio. The contract was executed between ODOT and Monoko, Inc. in 1997. The contract incorporates several documents, including the agreement, the proposal, ODOT's standard construction and material specifications ("CMS"), and the supplemental specifications, specifically, Supplemental Specification 815, also known as the "painting specification," which included specific requirements for the preparation and painting of steel structures.[1]

{¶ 3} Supplemental Specification 815, titled "Field Painting of Existing Steel, System OZEU," set forth the process to be used in preparing and painting the bridges. Surface preparation was to occur prior to the application of the painting process and required abrasive blast cleaning of all steel surfaces to be painted. Paint was then to be applied in a three-part process consisting of an organic zinc prime, an intermediate epoxy, and a final urethane coat. That process is known as the OZEU system.

{¶ 4} As part of Supplemental Specification 815, Monoko was required to designate its own quality-control specialist who was responsible for inspecting work on the project. In addition, a series of ten quality-control points were to be observed at designated points of completion during the preparation and painting

---

1. CMS Section 101.08 reads: "**Contract.** * * * The contract includes the invitation for bids, proposal, contract form and required bonds, specifications, supplemental specifications, special provisions, general and detailed plans, notice to contractor, change orders and supplemental agreements that are required to complete the construction of the work in an acceptable manner, including authorized extensions thereof, all of which constitute one instrument."

process. At those designated points, Monoko, as well as ODOT representatives, were given access to inspect the affected surfaces. Once ODOT representatives had inspected a particular step in the process, Monoko was allowed to continue with its work unless a defect was found, at which time that phase of work had to be corrected to comply with the specifications before the subsequent phase of work could begin.

{¶ 5} The contract also required the issuance of a performance bond as well as a payment bond, each in the amount of $619,000. The bonds were issued by Peerless Insurance Company in June 1997. The performance bond was issued pursuant to the statutory requirements of R.C. 5525.16, and required Monoko to provide a contract performance bond conditioned upon the contractor's performing the work upon the terms proposed, within the time prescribed, and in accordance with the plans and specifications, and that would indemnify the state against any damage that may result from the contractor's failure to perform accordingly. The payment bond was issued to ensure that all laborers, suppliers, and subcontractors were paid in full.

{¶ 6} Notably, the contract at issue did not include a specification establishing a warranty-maintenance-bond requirement for bridge painting. Such a specification was not "standard" in contracts that were signed in 1997 or 1998. Furthermore, the warranty provisions imposed by R.C. 5525.25 were not in effect when this contract was executed.

{¶ 7} Monoko performed work on the project in 1997 and/or 1998. ODOT representatives had the opportunity to inspect the work at the interim quality-control points. A final inspection was made on February 26, 1999. On April 29, 1999, ODOT sent a letter to Monoko setting forth corrective work to be completed prior to the final inspection/acceptance. In the "Report of Final Inspection," which was signed by the appropriate ODOT representative(s), ODOT listed a "work completed" date of May 11, 1999, and stated, "[W]e find the above Project has been completed in substantial conformity with the approved plans and specifications, including authorized changes and extra work. Accordingly, the Contractor [Monoko] is relieved of responsibility for further maintenance of this Project. This informal acceptance is subject to the provisions of the Construction and Material Specifications."

{¶ 8} Between 2002 and 2004, ODOT began investigating its bridge-painting projects following a tip from the United States Attorney's Office that it was investigating several bridge-painting contractors for offering bribes to ODOT employees. This eventually led to the indictment and conviction of several painting contractors, their principals, and ODOT inspectors. However, no Monoko representatives and no ODOT inspectors working on the Guernsey County bridges at issue here were ever indicted or accused of being involved in the

bribery scheme. As part of its investigation, ODOT hired an expert, Gary Tinklenberg, to conduct an investigation of approximately 250 bridges located throughout the state of Ohio, including the four bridges at issue in this case.

{¶ 9} In August 2005, ODOT filed a complaint against Monoko in the Guernsey County Court of Common Pleas, asserting claims for breach of contract and unjust enrichment. ODOT alleged that Monoko had breached the contract by failing to properly prepare the steel surfaces of four bridges, which were to be painted using the three-step "OZEU" process in accordance with the contract specifications, specifically Supplemental Specification 815. As a result of Monoko's failure to properly prepare the bridge surfaces, ODOT argued that Monoko's painting work was defective and thus, ODOT is entitled to damages. ODOT later amended its complaint to include Peerless and also sought recovery under the terms of the performance bond. The case was eventually removed to the Court of Claims of Ohio, due to the filing of an amended answer and counterclaim by appellees asserting claims for monetary relief.[2]

{¶ 10} On November 24, 2008, ODOT filed a motion for summary judgment against appellees. On January 23, 2009, appellees each filed cross-motions for summary judgment. On September 11, 2009, the referee issued a decision recommending that appellees' motions for summary judgment be granted and appellant's motion for summary judgment be denied. The referee found that prior to final acceptance, the terms of the contract gave ODOT the right to reject defective work and require corrective measures, even though ODOT's engineer had previously inspected and accepted the work at an earlier stage in the process. However, the referee determined that after final acceptance occurred, ODOT no longer retained the right to reject the work. Because ODOT had performed a final inspection and provided Monoko with a "Report of Final Inspection" stating that the project had been "completed in substantial conformity with the approved plans and specifications," the referee found that Monoko and Peerless had been released from further obligations and responsibilities, and ODOT was not entitled to recover.

{¶ 11} Following the filing of the referee's decision, appellant filed timely objections. Appellant also filed a motion to submit an additional expert affidavit expressing an opinion as to the correct interpretation of various contract provisions. The trial judge denied the motion to submit the affidavit of the expert, overruled the objections, and adopted the decision and recommendation of the referee. Because Monoko had not moved for summary judgment on its own

---

2. On November 30, 2007, the Court of Claims of Ohio determined that the counterclaims failed to state a claim for monetary relief against ODOT. Nevertheless, in exercising its discretion, the court declined to remand the action to the Guernsey County Court of Common Pleas, due to the prayer for declaratory relief against ODOT.

remaining claims for declaratory relief, the Court of Claims was unable to enter judgment as to those claims, even though its decision on the underlying cross-motions for summary judgment effectively decided four of the five declaratory claims by ruling that ODOT was barred from recovering. At the request of the parties, the Court of Claims added Civ.R. 54(B) language to its judgment entry and specifically found that there was no just reason for delay.[3] This appeal followed.

## II. Assignments of Error

{¶ 12} ODOT raises three assignments of error for our review:

Assignment of Error No. 1:

The trial court erred in granting summary judgment in favor of Monoko, Inc. and Peerless Insurance Company, upon a ruling that a public owner, by issuing final acceptance of a construction project, waives its contractual right to pursue a remedy for defects found after the project is completed.

Assignment of Error No. 2:

The trial court erred in granting summary judgment in favor of Monoko, Inc. and Peerless Insurance Company, upon a ruling that a public owner, by possessing the right to conduct periodic inspections during a construction project, waives its contractual right to pursue a remedy for defects found after the project is completed.

Assignment of Error No. 3:

The trial court erred in denying summary judgment in favor of the Ohio Department of Transportation by applying the defenses of equitable estoppel and waiver apply even though the department was acting in the exercise [of] a government function.

## III. Standard of Review

{¶ 13} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103,

---

3. On April 8, 2010, this court, sua sponte, issued an entry ordering appellant to show cause as to why this appeal should not be dismissed for lack of a final, appealable order, due to the matters remaining to be determined. On April 16, 2010, appellant filed its memorandum. On April 27, 2010, appellees filed a response. Upon review of said memoranda, this court is satisfied that the order from which this appeal arises is a final, appealable order. The fifth remaining declaratory claim addressed whether appellees were the prevailing parties as defined in R.C. 2335.39. Because appellees failed to comply with the requirements of R.C. 2335.39 by filing a motion within 30 days of the final judgment, appellees waived their opportunity to seek that relief.

701 N.E.2d 383. We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 41–42, 654 N.E.2d 1327.

{¶ 14} Summary judgment is proper only when the party moving for summary judgment demonstrates that (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343.

{¶ 15} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. Id. Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. Id. If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. Id.

## IV. Arguments

{¶ 16} We begin by noting that appellant has framed two of its three assignments of error in the context of asserting that the trial court's rulings are ones that are in error as generally applied to all public owners. However, ODOT's claims for breach of contract and unjust enrichment are based upon the contract it executed with Monoko. We further note that the decision at issue dealt with only the specific parties involved in this action, not with all public owners generally, and focused upon the contract at issue. Thus, our review of the assignments of error shall be limited to that context.

{¶ 17} The central issue in this matter is whether ODOT can recover damages from Monoko for alleged defects found several years after ODOT inspected the project and issued final acceptance of the project. Also at issue is whether appellant can recover against Peerless as the surety who issued the payment and performance bonds for the project. Because ODOT's three assignments of error

are closely related, we shall address them jointly. Together, ODOT's appeal sets forth five basic challenges.

{¶ 18} First, ODOT argues that the agreement specifically preserves its right to enforce the terms of the contract at the time it discovers the breach, regardless of whether or not ODOT conducted periodic inspections and issued final acceptance. Therefore, Monoko and its surety remain contractually liable for poor workmanship, because the issuance of final acceptance does not serve as an assurance that the work satisfied the contract specifications. Similarly, ODOT contends that it did not waive its ability to enforce the contract simply because it possessed the right to inspect the work during the course of the project. Rather, the contract places the responsibility for finding and correcting defects in the surface preparation on Monoko's quality-control specialist, who has an independent duty, apart from any obligation of ODOT to perform spot checks at each quality-control point throughout the project, to inspect the entire bridge for defects. Although ODOT concedes that it may have the responsibility to perform spot checks at each quality-control point throughout the project, it argues that Monoko's obligation to inspect the entire structure is not contingent upon ODOT's inspection.

{¶ 19} Next, ODOT argues that the referee's interpretation of CMS Sections 109.08 and 109.09 is incorrect, as is his determination that despite the language in CMS Section 107.20, CMS Sections 109.08 and 109.09 terminate Monoko's responsibility for the entire project and require ODOT to reject any defective work prior to the issuance of final acceptance. Instead, ODOT submits that the context of those two sections refers to final payment and the release of the contractor from the obligation to maintain the job site, not from all liability, and thus CMS Section 109, specifically 109.073, 109.08, and 109.09, does not require ODOT to reject defective work prior to the issuance of final acceptance.

{¶ 20} ODOT further asserts that the referee's decision improperly applied the defenses of equitable estoppel and waiver to find that ODOT had waived its right to enforce the contract by either inspecting the work or by issuing final acceptance of the project. ODOT argues that the defenses of equitable estoppel and waiver are not applicable against a governmental agency exercising a governmental function, and Monoko cannot meet any exceptions to this general rule.

{¶ 21} Finally, ODOT argues that Monoko's surety, Peerless, is also contractually liable for the poor workmanship, even if CMS Section 109.09 terminates Monoko's responsibility for the entire project, based upon the issuance of the performance bond. ODOT submits that CMS Section 109.09 clearly states that the bond survives, and thus, ODOT is entitled to recover for the nonperforming work pursuant to the performance bond. ODOT argues that the bond requires all work to be performed according to the project specifications and argues that

the bond does not include an expiration provision, is not time-sensitive, and does not require that a claim be presented prior to final acceptance.

{¶ 22} Appellees, on the other hand, argue that the contract does not afford a right to remedy alleged defects after final acceptance by ODOT. In essence, appellees submit that ODOT had no contractual right to pursue a remedy for defects in 2005 after it had issued final acceptance in 1999. Appellees assert that under the contract as it was written in 1997, ODOT did not include a term for pursuing a contractual right or remedy following final acceptance, and nothing within Supplemental Specification 815 either permits an inspection for perform-ance several years after final acceptance or provides for any type of painting warranty. Because the language contained in CMS Section 109.09 specifically states that the contractor is relieved of further obligations upon final acceptance, except for its obligations under the bond, appellees submit that the terms of the contract expire at final acceptance.

{¶ 23} Appellees also contend that ODOT's interpretation of CMS Section 107.20 fails to consider the contract as a whole and would render 109.08 and 109.09, as well as other sections, meaningless. Appellees argue that there was no waiver of rights because the contract terms at issue in the "no waiver" provision dealt with ODOT action *prior* to final acceptance, but here, ODOT is attempting to assert a right that it claims to have *after* final acceptance. They argue no such right exists because the effect of final acceptance, as stated in the contract, is to relieve the contractor from the contract terms.

{¶ 24} As to the claim against the performance bond, appellees submit that the language in CMS Section 109.09, which states, "The Contractor will then be released from further obligations except as set forth in his bond," actually refers to the payment bond, not the performance bond, because pursuant to R.C. 5525.16, claims can be made against the payment bond for up to 90 days following final acceptance. Furthermore, appellees argue that pursuant to R.C. 5525.17, ODOT cannot assert a claim against a performance bond after completion and acceptance of the project based upon the use of present-tense language in the statute. Finally, appellees cite the general rule that when a party releases a principal from its obligations, the principal's surety, who is secondarily liable, is also discharged, and thus they argue that Peerless cannot be held liable on the performance bond because Monoko has been released of its obligations.

## V. Analysis

### A. The Effect of Periodic Inspections, Final Inspection, and Final Accep-tance and the Interplay Between CMS Sections 107.20, 109.08, and 109.09

{¶ 25} Citing CMS Section 107.20 and arguing that the language in this section precludes a contractor from asserting any waiver-like defenses, ODOT

contends that the contract at issue specifically preserves its right to enforce the terms of the contract at the time it discovers the breach, and thus, Monoko and its surety remain contractually liable for poor workmanship, regardless of whether final acceptance has occurred. ODOT also contends that the contract at issue specifically preserves ODOT's right to enforce the terms of the contract at any point, including post-final acceptance, regardless of whether ODOT conducted periodic inspections. ODOT argues that it should not be found to have waived its ability to enforce a contract simply because it possessed the right to inspect the work during the course of the project. ODOT submits that CMS Section 107.20 supports its position that not inspection, payment, or acceptance of the work waives its right to recover damages here.

{¶ 26} CMS Section 107.20 reads as follows:

**107.20 No Waiver of Legal Rights.** Neither the inspection by the Engineer; nor by any of his duly authorized representatives, nor any order, measurements, or certificate by the Director, or said representatives, nor any order by the Director for the payment of money, nor any payment for, nor acceptance of any work by the Director, nor any extension of time, nor any possession taken by the State or its duly authorized representatives, shall operate as a waiver of any provision of this contract, or of any power herein reserved to the State, or any right to damages herein provided; nor shall any waiver or any breach of this contract be held to be a waiver of any other subsequent breach.

{¶ 27} ODOT takes issue with the referee's interpretation of CMS Sections 109.08 and 109.09 and disputes the referee's determination that those provisions terminate Monoko's responsibility for the entire project, citing the language in 107.20, which it argues is in conflict with the other two provisions. CMS Section 109.08 provides:

**109.08 Acceptance and Final Payment.** Before the final estimate is allowed the Director may require the Contractor to submit an affidavit from each and every subcontractor showing that all claims and obligations arising in connection with the performance of his portion of the contract have been satisfactorily settled. The improvement shall be inspected by the Director, and *if he finds the work is completed according to the contract,* there shall be issued certificates of the amount of work done and the Contractor shall receive the balance due on the contract. It is expressly stipulated that the State of Ohio shall make final acceptance and payment promptly after the contract has been fully completed and final inspection made. No payment shall be made for any unauthorized work.

(Emphasis added.)

{¶ 28} CMS Section 109.09 reads as follows:

**109.09 Termination of Contractor's Responsibility.** This contract will be considered complete when all work has been completed, and the final inspection made, the work accepted and the final estimate approved, in writing, by the Director. The Contractor will then be released from further obligations except as set forth in his bond. The date the final estimate is approved, in writing, by the Director shall constitute the acceptance contemplated by Section 5525.16 ORC.

{¶ 29} ODOT argues that the referee's determination that when read together, CMS Sections 109.08 and 109.09 require ODOT to reject any defective work prior to the issuance of final acceptance, fails to understand the context of the two sections. ODOT submits that the sections actually refer to final payment and the release of the contractor from the obligation to maintain the job site, rather than the release of the contractor from liability. Furthermore, ODOT contends that "final acceptance" has no bearing on the quality of the work and is not an assurance that the work satisfied the contract specifications. Instead, ODOT submits that "final acceptance" simply means that the contractor has repaired the site, the contractor can receive final payment, and maintenance of the site is transferred back to ODOT.

{¶ 30} The construction of a written contract is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. The purpose of contract construction is to realize and give effect to the intent of the parties. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. "When construing the terms of a contract, a court's principal objective is to determine the intent of the parties." *Cleveland Constr., Inc. v. Kent State Univ.*, 10th Dist. No. 09AP–822, 2010-Ohio-2906, 2010 WL 2553694, ¶ 29, citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 273, 714 N.E.2d 898. The intent of the parties is presumed to reside in the language that they chose to use in the agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 132, 31 OBR 289, 509 N.E.2d 411. In determining the intent of the parties, the court must read the contract as a whole and give effect to every part of the contract, if possible. *Clark v. Humes*, 10th Dist. No. 06AP–1202, 2008-Ohio-640, 2008 WL 435003; *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361–362, 678 N.E.2d 519. The intent of each part is to be gathered from consideration of the contract as a whole. Id. at 361–362; *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, 10th Dist. No. 09AP–06, 2009-Ohio-6478, 2009 WL 4698515, ¶ 23. When parties to a contract dispute the meaning of the contract language, courts must first look to the four corners of the document to determine whether an ambiguity exists. *Buckeye Corrugated, Inc. v. DeRycke*, 9th Dist. No. 21459, 2003-Ohio-6321, 2003 WL 22797246. "[I]f the

contract terms are clear and precise, the contract is not ambiguous and the trial court is not permitted to refer to any evidence outside of the contract itself[.]" *Ryan v. Ryan* (Oct. 27, 1999), 9th Dist. No. 19347, 1999 WL 980572. A court must construe a contract against its drafter, but when the terms are unambiguous and clear on their face, the court need not look beyond the plain language of the contract in order to determine the rights and obligations of the parties. *National/RS, Inc. v. Huff*, 10th Dist. No. 10AP–306, 2010-Ohio-6530, 2010 WL 5550694, ¶ 15, citing *EFA Assocs., Inc. v. Dept. of Adm. Servs.*, 10th Dist. No. 01AP–1001, 2002-Ohio-2421, 2002 WL 1013052, ¶ 31.

{¶ 31} Arguably, at first glance, CMS Sections 107.20, 109.08, and 109.09 appear to potentially be in conflict with each other. However, upon closer inspection, and upon reading the contract as a whole, we find no conflict and that the language of the contract is clear and unambiguous.

{¶ 32} The general structure of the CMS supports appellees' argument that CMS Section 107.20 is not applicable to final acceptance. Section 107 of the CMS is titled "Legal Relations and Responsibility to Public." Generally, this section deals with a wide range of issues, including permits and environmental issues, safety issues, insurance and liability issues, and general legal issues. These subsections appear to address issues that may arise during the course of the project. Focusing more specifically upon the language in CMS Section 107.20, that particular provision sets forth a host of events that shall *not* constitute a waiver of any provision of the contract, or "of any power herein reserved to the State, or any right to damages herein provided." The events that shall not operate as a waiver include "any order by the Director for the payment of money," as well as "any payment for, [or] acceptance of any work by the Director."

{¶ 33} Section 109, on the other hand, is titled "Acceptance, Measurement, and Payment" and contains provisions setting forth guidelines for compensation, partial payment, final inspection, and final acceptance and payment. Specifically, subsections 109.08 and 109.09 deal with final acceptance, final payment, and termination of the contractor's responsibility. Most of the subsections in 109 generally deal with topics related to the wrapping up of the contract, payments, and the end of the project, not with topics related to the ongoing progress of the project.

{¶ 34} We also find the use of differing terms or phrases in these sections to be notable as well. While CMS Section 107.20 uses the terms "acceptance" and "payment," CMS Section 109.09 refer to "*final* inspection" and "*final* estimate" and CMS Section 109.08 refers to "*final* payment," "*final* acceptance and payment," and "*final* estimate." (Emphasis added.) The parties clearly anticipated that ODOT representatives would be inspecting the work at intermediate

points in the project, as referenced in Supplemental Specification 815.03. It is apparent that the "acceptance" and "payment" reflected in CMS Section 107.20 refer to payments or acceptance of work at the intermediate quality-control points, rather than the final acceptance referenced in CMS Section 109.09. We find this distinction to be important, and one that leads us to determine that the language in CMS Section 107.20 (the "no waiver" language) does not apply to final acceptance. Thus, there is no conflict between CMS Sections 107.20, 109.08, and 109.09.

{¶ 35} In addition, we reject ODOT's contention that final acceptance has no bearing on the quality of the work and is not an assurance that the work met the contract specifications. It is evident, based upon Supplemental Specification 815, that the parties anticipated numerous quality-control point inspections that required inspection by both the contractor and an ODOT representative prior to advancing to the next operational step. And if there was a deficiency, it had to be corrected prior to beginning the next phase of work, although corrections could still be made, if defects were discovered later, up until the point of final acceptance. In addition to these periodic inspections, the contract also mandated that ODOT's director, prior to final acceptance and payment, inspect the bridge, and if he found that the work was completed according to the contract, the remaining balance due on the contract would be paid and final acceptance would be issued. See CMS Section 109.08. The "Final Acceptance Report" directly contradicts ODOT's claim to the contrary in that it states that the project "has been completed in substantial conformity with the approved plans and specifications." Thus, final acceptance clearly marks ODOT's acceptance of the work as having been properly performed in an acceptable manner and in accordance with the requirements of the contract.[4]

{¶ 36} Finally, we find meritless the assertion by ODOT that the use of the phrase "final acceptance" in CMS Section 109.09 actually contemplates Monoko's release from its continuing obligation to maintain the job site, rather than its release from the entire project and from liability. This assertion by ODOT is not supported by other provisions of the contract.

{¶ 37} ODOT cites CMS Section 105.14, "Maintenance During Construction," in support of its position that the contractor is required to maintain the work during construction until the project is accepted. ODOT also cites CMS Section 107.16, "Contractor's Responsibility for Work." This subsection states that the contrac-

---

4. ODOT did not argue in the Court of Claims that the defects at issue were latent or hidden so as not to be discernable. Based upon the affidavit of ODOT's expert, Gary Tinklenberg, the referee determined that the reference to "substantial defects" that were "so significant and distributed over all of the painted surfaces" was an indication that the alleged defects were not latent.

tor must take precautions against injury or damage and must rebuild or repair any damages that result from any cause (except unforeseeable causes) before final acceptance. ODOT submits that these provisions demonstrate that "final acceptance" is the means by which the contractor returns the job site to ODOT and nothing more.

{¶ 38} While that interpretation may be the way that ODOT wishes the contract were written, we find that is not what the contract actually says, and ODOT's interpretation of CMS Section 107.20 would render meaningless numerous other provisions of the contract. Instead, the language of the contract, when considered as a whole, supports the idea that "final acceptance" refers to the release of Monoko from liability for the project. Besides CMS Section 109.09, another subsection of the contract that supports this interpretation is CMS Section 105.11, titled "Inspection of Work." It reads:

> If the Engineer requests it, the Contractor, at any time before acceptance of the work, shall remove or uncover such portions of the finished work as may be directed. * * * Failure to reject any defective work or material shall not in any way prevent later rejection when such defects are discovered, *or obligate the State of Ohio to final acceptance.*

(Emphasis added.)

{¶ 39} This language indicates that ODOT has up until the point of final acceptance to discover defects and reject the work. See also CMS Section 109.071 ("The Contractor shall not be required to maintain portions of the highway or structures which have been completed and accepted, but he is required to repair any damage caused by his operations, defective work, or noncompliance with the plans, specifications and contract until the final estimate has been approved by the Director") and CMS Section 109.072 ("The Contractor shall not be required to maintain portions of the highway or structures which have been completed and accepted, but he is required to repair any damage caused by his operations, defective work, or noncompliance with the plans specifications and contract until the final estimate has been approved by the Director").

{¶ 40} Significantly, we also note that the CMS and the other corresponding documents that make up the contract were drafted by ODOT. If ODOT had intended for CMS Sections 109.08 and 109.09 to be applied only to release Monoko from its obligation to maintain the project upon the issuance of final acceptance, ODOT could have easily drafted these provisions in a manner to reflect that; however, it did not do so. In addition, ODOT could have just as easily created postacceptance remedies, but it failed to include a provision for those either.

**B. Application of Waiver and Equitable Estoppel and the Terms and Rights Set Forth in the Contract**

{¶ 41} ODOT further contends that the language in CMS Section 107.20 firmly establishes that the acceptance of any work and/or any payment of money cannot be used to waive the rights provided to ODOT under the contract, and as a result, final acceptance does not operate to waive its right to collect damages at a later date for defective work that was not performed according to the contract specifications. Yet a close reading of CMS Section 107.20 reveals that that provision states that those events listed shall not waive "any provision of this contract" or "any power herein reserved to the State" or "any right to damages herein provided." Notably, ODOT's contract does not reserve any right to damages, nor does it reserve any such power to facilitate a remedy for damages, *after final acceptance.* Furthermore, the contract does not include a bridge-painting warranty. And the contract does not include a provision that allows it to inspect the work at some future date after final acceptance and to collect damages if it discovers that the work, despite ODOT's final inspection and final acceptance of that work, was not performed in accordance with the contract specifications.

{¶ 42} ODOT repeatedly argues that final acceptance does not waive its contractual rights. Yet the terms of the contract do not establish and/or retain the rights that ODOT now claims to have. In fact, the contract contains no terms that provide ODOT with the "contractual" rights it purports to have. Instead, the contract clearly states in CMS Section 109.09 that following the completion of all work, and following the final inspection and ODOT's acceptance of that work, Monoko "will then be released from further obligations except as set forth in [its] bond." This particular contract term specifically releases Monoko from further obligations and bars any potential rights that ODOT may have had generally to seek a remedy for performance-related work, once final acceptance had been made. After releasing Monoko from further obligations after final acceptance, the contract does not reserve the power to come back after final acceptance and obtain damages for performance-related issues.

{¶ 43} However, the contract clearly provides authority for ODOT to go back to work that was previously accepted at intermediate quality-control points and order Monoko to correct defects that are discovered after that particular quality-control point has passed, but before final acceptance has been issued. Supplemental Specification 815.03(B) provides that "[d]iscovery of defective work or material after a Quality Control Point is past or failure of the final product before final acceptance, shall not in any way prevent rejection or obligate the State of Ohio to final acceptance." CMS Section 105.11 sets forth a similar provision. That provision reads:

**105.11 Inspection of Work.** \* \* \* If the Engineer requests it, the Contractor, at any time before acceptance of the work, shall remove or uncover such portions of the finished work as may be directed. After examination, the Contractor shall restore said portions of the work to the standard required by the specifications. \* \* \* Failure to reject any defective work or material shall not in any way prevent later rejection when such defects are discovered, or obligate the State of Ohio to final acceptance.

{¶ 44} True, these provisions provide ODOT with certain rights and remedies while the project is ongoing, even if a particular quality-control point has already been passed and the work at that particular point has already been accepted, *but only so long as final acceptance has not yet been given.* The language of these provisions indicates that the right to reject defective work ends after final acceptance, based upon the use of phrases such as "before final acceptance" and "or obligate the State of Ohio to final acceptance."

{¶ 45} ODOT appears to argue that as a result of the ruling by the Court of Claims, an owner like ODOT would never be able to recover damages against a contractor following final acceptance. However, this is not necessarily the case. That right is dependent upon the specific terms of each particular contract. Additionally, at least one court has made a finding that acceptance of a final payment can constitute a waiver of all claims when the contract contains a clause providing for the release of claims upon final payment. See *Mon–Rite Constr. Co. v. Northeast Ohio Regional Sewer Dist.* (1984), 20 Ohio App.3d 255, 20 OBR 317, 485 N.E.2d 799, paragraph one of the syllabus (a contract clause that provides for the release of all claims upon final payment is valid). Although the clause in the contract at issue may not have been as explicit as that found in *Mon–Rite,* it is still evident, based upon the language in CMS Section 109.09, that Monoko's obligations terminated upon final acceptance.

{¶ 46} In addition, ODOT argues that the referee's decision improperly determined that ODOT had "waived" its right to *enforce* the contract by either inspecting the work or issuing final acceptance of the project because the defenses of equitable estoppel and waiver are not applicable against a governmental agency exercising a governmental function. ODOT contends that the administration of its contract with Monoko for the repair and painting of bridges is a governmental function. ODOT further argues that Monoko cannot demonstrate that estoppel and waiver are applicable under the exceptions set forth in *Pilot Oil Corp. v. Ohio Dept. of Transp.* (1995), 102 Ohio App.3d 278, 656 N.E.2d 1379.

{¶ 47} We disagree with ODOT's characterization of the referee's decision on this issue. Here, the equitable principles and affirmative defenses of waiver and estoppel were not applied by the referee to "waive" ODOT's right to enforce the

contract. Instead, the referee found, correctly, that the terms of the contract itself speak directly to the effect of final acceptance, which in turn released the contractor from further obligations.

{¶ 48} In the instant case, there is no contractual right to pursue a remedy for defective work once final acceptance has been made. The contract contains no provision that gives ODOT the right to pursue a remedy under those circumstances. As Monoko has pointed out, in order to "waive" the right to enforce the contract, there must first be a contract term to enforce. Here, there is no right that exists to be "waived." The language in CMS Section 109.09 clearly states that upon the completion of the final inspection and upon final acceptance of the work and the approval of the final estimate, "[t]he Contractor will then be released from further obligations except as set forth in his bond."

{¶ 49} Furthermore, we need not determine whether ODOT could be estopped from denying the validity of its issuance of "final acceptance" of the project, given that the language in the contract clearly addresses the effect of "final acceptance." CMS Section 107.20 states that inspections at various quality-control points and acceptance of the work at those intermediate quality-control points and/or intermediate partial payments cannot be used to claim that such acceptance and/or payments "waived" ODOT's right to later reject that work and require Monoko to go back and repair any problems or defects. Nevertheless, this ban on the affirmative defense of waiver does not apply with respect to final acceptance, based upon the language used in the contract.

{¶ 50} Simply put, the agreement drafted by ODOT included a provision that terminated the contractor's responsibilities and released it from further obligations upon completion of the work and after the final inspection had been made, the work accepted, and the final estimate approved in writing. By including this particular provision in the contract, ODOT, using language it drafted, released Monoko from any further obligations upon final acceptance, thereby relieving Monoko of responsibility for various potential obligations, including future liability for breach of the specifications or faulty materials and workmanship, and thus barring ODOT from pursuing further action against Monoko.

{¶ 51} Additionally, ODOT failed to include a warranty provision or other contractual provision that would allow a future inspection after final acceptance and/or provide a remedy for performance-related defects found after final acceptance. As a result, ODOT cannot recover for performance-related defects now, based upon the terms as set forth in the contract. While this may appear inequitable, we cannot rewrite the provisions of a contract. "It is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result." *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 362, 678 N.E.2d 519.

See also *Cleveland Constr., Inc.*, 2010-Ohio-2906, 2010 WL 2553694, at ¶ 31, citing *N. Buckeye Edn. Council Group Health Benefits Plan v. Lawson*, 103 Ohio St.3d 188, 2004-Ohio-4886, 814 N.E.2d 1210, ¶ 20 ("However, courts cannot decide cases of contractual interpretation on the basis of what is just or equitable").

### C. The Performance Bond and Peerless's Liability

{¶ 52} ODOT argues that the performance bond at issue was to guarantee that the bridge-painting project would be completed according to the contract specifications. ODOT alleges that Monoko did not perform according to the specifications. ODOT submits that Peerless's liability for the defective work performed by Monoko is not contingent upon whether the defect was discovered before or after ODOT accepted the project. ODOT further contends that the distinction drawn in the statutory framework between payment bonds and performance bonds strongly suggests that the General Assembly did not intend to bar an owner like ODOT from making a claim against a performance bond after completion and final acceptance, because unlike a payment bond, there is no statutory time limit imposed for performance bonds, and because a defect covered by a performance bond may not surface or be discovered for several years after the completion of the project.

{¶ 53} The contract performance bond executed in this case states:

### CONTRACT PERFORMANCE BOND
#### (5525.16, 153.54 et seq.)

* * * Now, if the said principal shall well, truly and faithfully comply with and perform each and all of the terms, covenants and conditions of such contract on his (its) part to be kept and performed, according to the tenor thereof, and within the time prescribed and will perform the work embraced therein upon the terms proposed and within the time prescribed and in accordance with the plans, specification and estimates furnished therefore, to which reference is here made, the same being a part hereof, as if fully incorporated herein, and will indemnify the State, County, Municipality and Township, and in case of a railroad grade separation, the railroad company (or companies) involved against any damage that may result by reason of the negligence of the contractor in making said improvement or doing said work, then this obligation shall be void, otherwise the same shall remain in full force and effect[.]

{¶ 54} R.C. 5525.16 sets forth requirements for contract performance bonds and payment bonds. It provides:

(A) Before entering into a contract, the director of transportation shall require a contract performance bond and a payment bond with sufficient sureties, as follows:

(1) A contract performance bond in an amount equal to one hundred per cent of the estimated cost of the work, conditioned, among other things, that the contractor will perform the work upon the terms proposed, within the time prescribed, and in accordance with the plans and specifications, will indemnify the state against any damage that may result from any failure of the contractor to so perform[.]  * * *

(2) A payment bond in an amount equal to one hundred per cent of the estimated cost of the work, conditioned for the payment by the contractor and all subcontractors for labor or work performed or materials furnished in connection with the work, improvement, or project involved.
* * *

(C) Any person to whom any money is due for labor or work performed or materials furnished in connection with a work, improvement, or project, at any time after performing the labor or furnishing the materials but not later than ninety days after the acceptance of the work, improvement, or project by the director, may furnish to the sureties on the payment bond a statement of the amount due the person.  If the indebtedness is not paid in full at the expiration of sixty days after the statement is furnished, the person may commence an action in the person's own name upon the bond as provided in sections 2307.06 and 2307.07 of the Revised Code.

An action shall not be commenced against the sureties on a payment bond until sixty days after the furnishing of the statement described in this section or, notwithstanding section 2305.12 of the Revised Code, later than one year after the date of the acceptance of the work, improvement, or project.

{¶ 55} R.C. 5525.17, which is titled "Failure of contractor or surety to complete work," reads:

If a contractor *has not commenced* his work within a reasonable time, or *does not carry* the same forward with reasonable progress, or *is improperly performing his work,* or *has abandoned, or fails or refuses to complete a contract* entered into under Chapters 5501., 5503., 5511., 5513., 5515., 5516., 5517., 5519., 5521., 5523., 5525., 5527., 5528., 5529., 5531., 5533., and 5535. of the Revised Code, the director of transportation shall make a finding to that effect and so notify the contractor in writing, and *the rights of the contractor to control and supervise the work* shall immediately cease.  The director shall forthwith give written notice to the sureties on the bonds of such contractor of such action.  If, within ten days after the receipt of such notice, such sureties on the contract performance bond or any one or more of them notify the director in writing of their intention to enter upon and complete the work covered by such contract, such sureties shall be permitted to do so and the director shall allow them thirty days, after the receipt of such notice in writing,

within which to enter upon the work and resume construction, unless such time is extended by the director for good cause shown.

(Emphasis added.)

{¶ 56} In reviewing the provisions above, it is apparent that the language used in the contract performance bond and in R.C. 5525.16 with respect to performance bonds does not impose a specific limitation on the life of the performance bond, unlike the statutory framework set forth for payment bonds in R.C. 5525.16. ODOT submits that this fact strongly suggests that the legislature structured the statutes in this manner because it did not intend to bar a public owner from making a claim against a performance bond after the project has been completed. However, we disagree.

{¶ 57} We find that the reference to "except as set forth in his bond" as found in CMS Section 109.09 refers to the payment bond, rather than the performance bond. Immediately following the phrase "except as set forth in his bond" is the following language: "The date the final estimate is approved, in writing, by the Director shall constitute the acceptance contemplated by Section 5525.16." The "acceptance contemplated by Section 5525.16 ORC" is relevant only with respect to the payment bond, the date of the acceptance triggers the running of the clock with respect to the 90–day deadline, by which time a "person to whom any money is due for labor or work performed or materials furnished in connection with a work, improvement, or project, * * * may furnish to the sureties on the payment bond a statement of the amount due the person." R.C. 5525.16(C) further states that an action shall not be commenced against the sureties on a payment bond "later than one year after the date of the acceptance of the work, improvement or project." And as previously stated, no such time frame applies with respect to performance bonds.

{¶ 58} Furthermore, as argued by appellees, the use of the present tense in R.C. 5525.17, which provides for a claim against a performance bond, is additional evidence that a performance bond was intended to be valid only prior to commencement of the work and for the time the project was ongoing, not after the work has been completed and accepted. For example, the title of the statute itself is "Failure of contractor or surety to complete work." The statute also discusses the process to be followed if the contractor "has not commenced his work" or "is improperly performing his work" or "has abandoned" or "fails or refuses to complete a contract." The statute provides that in such cases, the contractor shall be notified in writing, and his right to control and supervise the work "shall immediately cease." Here, none of these actions are applicable or even possible, given that the work was completed and accepted several years prior to the filing of ODOT's complaint, lending further credence to the position

that the performance bond was not intended to be applicable after completion of the entire project and the issuance of final acceptance.

{¶ 59} Finally, as evidenced by the "Report of Final Inspection," ODOT determined in 1999 that Monoko had complied with and performed the terms of the contract (the "Project has been completed in substantial conformity with the approved plans and specifications"). As a consequence, Monoko, as the principal, was released from further obligations upon the issuance of this final acceptance. Because ODOT released Monoko, as the principal, from its obligations, Peerless, as Monoko's surety, is also released from liability, except for its obligations under the payment bond, which we discussed above. See *Ide v. Churchill* (1863), 14 Ohio St. 372, 383, quoting *Ohio v. Blake*, 2 Ohio St. Rep. 147 (" 'Without a principal there can be no accessory, and by the extinction of the liability of the former, the latter becomes extinct' "); *Dressler Properties, Inc. v. Ohio Heart Care, Inc.*, 5th Dist. No. 2004CA00231, 2005-Ohio-1069, 2005 WL 578756, ¶ 14 (the general rule is that whatever discharges the principal also discharges the surety, so if the principal has been released, the surety will also be released); *O'Brien v. Ravenswood Apts., Ltd.*, 169 Ohio App.3d 233, 2006-Ohio-5264, 862 N.E.2d 549, ¶ 20 (a surety's secondary obligation exists only so long as the principal owes performance of the underlying obligation; when the obligation of the principal is extinguished, the obligation of the surety is also extinguished unless the surety consents to continued liability).

{¶ 60} Thus, we hold that Peerless cannot be held liable to ODOT pursuant to the performance bond.

## VI. Conclusion

{¶ 61} Based upon the foregoing analysis, we hold that ODOT cannot recover as against Monoko or Peerless, pursuant to the terms of the contract, and thus, the Court of Claims of Ohio properly granted summary judgment in favor of appellees and properly denied summary judgment as to ODOT. Accordingly, we overrule appellant's first, second, and third assignments of error. The judgment of the Court of Claims of Ohio is affirmed.

Judgment affirmed.

BRYANT, P.J., and TYACK, J., concur.