NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0438n.06

No. 11-4077

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 17, 2014
DEBORAH S. HUNT, Clerk

ARLINGTON VIDEO PRODUCTIONS, INC., )
)
    Plaintiff – Appellant, )
)
v. )
)
FIFTH THIRD BANCORP, )
)
    Defendant – Appellee. )
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

**OPINION**

Before: ROGERS and STRANCH, Circuit Judges; PEARSON, District Judge.[*]

**JANE B. STRANCH, Circuit Judge.** Arlington Video Productions, Inc. ("Arlington")
filed suit against Fifth Third Bank ("the Bank")[1] alleging individual and class claims for breach of
the Bank's contractual obligation to inform customers in advance that certain service fees would
be charged to their accounts. The district court denied Arlington's motion for class certification
and subsequently granted the Bank's motion for summary judgment on Arlington's individual
claim. Arlington appealed both decisions. We concluded that the district court erred in granting
summary judgment in favor of the Bank on Arlington's individual claim and in denying
Arlington's class certification motion. Observing that it was the district court's prerogative to

_____

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of
Ohio, sitting by designation.

[1]Arlington's original Complaint incorrectly identified the defendant as Fifth Third
Bancorp, a holding company. The proper defendant is Fifth Third Bank, as specified in
Arlington's First Amended Class Action Complaint.

1

define the class in accordance with our opinion and to make any refinements to the class definition that might be necessary to manage the litigation, we reversed and remanded for further proceedings. *Arlington Video Prods., Inc. v. Fifth Third Bancorp*, 515 F. App'x 426 (6th Cir. 2013). We denied the Bank's petition for rehearing by the panel and for rehearing en banc. The Bank filed a petition for a writ of certiorari. The Supreme Court granted the Bank's petition, vacated our prior judgment, and remanded the case to this court for further consideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). *Fifth Third Bancorp v. Arlington Video Prods., Inc.*, 134 S. Ct. 212 (2013) (mem.) (GVR order).

Recognizing that the GVR order does not necessarily imply that the Supreme Court has in mind a different result in this appeal, *see Tyler v. Cain*, 533 U.S. 656, 666 n.2 (2001); *Cmtys. For Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006), we directed the parties to file supplemental briefs on remand. Upon reconsideration, and for the reasons set forth below, we **REVERSE** the grant of summary judgment in favor of the Bank on Arlington's individual claim and we **REVERSE** the district court's order denying class certification. We **REMAND** the case to the district court for further proceedings on Arlington's individual claim and to determine in the first instance whether class certification is appropriate. The district court should undertake the class certification inquiry in accordance with the contract analysis we outline in this opinion and in light of Supreme Court precedent, including but not limited to, *Comcast Corp.*, *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013), and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and further in light of this court's class certification cases, particularly those cases decided after the district court initially denied Arlington's class certification motion in September 2010.

## I. FACTS

Arlington is an Ohio corporation that provides video services to clients. Arlington's sole shareholder is Evan Newman, who at all times conducted Arlington's business affairs. The Bank is an Ohio corporation conducting business in twelve states: Ohio, Kentucky, Michigan, Tennessee, Indiana, Illinois, Missouri, Pennsylvania, West Virginia, North Carolina, Georgia, and Florida.

Arlington opened a business checking account with the Bank on August 3, 2000, known as a Business 5/3 account. Newman signed a signature card that included seven paragraphs of "TERMS AND CONDITIONS," the first two of which read:

> 1. The terms and conditions stated herein, together with resolutions or authorizations which accompany this signature card, if applicable, and the Rules, Regulations, Agreements, and Disclosures of Bank constitute the Deposit Agreement ("Agreement") between the individual(s) or entity(ies) named hereon ("Depositor") and the Bank.
>
> 2. This Agreement incorporates the Rules, Regulations, Agreements, and Disclosures established by Bank from time to time, clearing house rules and regulations, state and federal laws, recognized banking practices and customs, *service charges as may be established from time to time* and is subject to laws regulating transfers at death and other taxes.

R. 83-1, Page ID 3303 (emphasis added). When Newman signed the signature card, Arlington granted the Bank a security interest in the account and agreed to allow the Bank at any time to "set off, against any balance in this account . . . any debt owed to Bank by any entity listed" on the account. *Id.* ¶ 6. Arlington further agreed to all of the specified terms and conditions listed on the signature card, acknowledged receipt of a "copy of the Rules and Regulations, Agreements, and Disclosures of Bank," and further agreed "to the terms set forth therein." *Id.* ¶ 7.

3

The phrase "Rules and Regulations" referred to the Bank's "Rules & Regulations Applicable To All Fifth Third Accounts and Cards June 1, 2000" (hereinafter "Rules & Regulations"). R. 83-1, Page ID 3304–3338. Paragraph 9 of that document provided:

> These Rules and Regulations, *as well as fees and charges contained on the Fee Schedule* may be altered or amended at any time by the Bank and as altered or amended shall be binding on all Customers after having been made available in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law.

*Id.*, Page ID 3307 (emphasis added). Paragraph 23 of the document specifically concerned a "returned item fee" and provided: "When a deposited item is returned unpaid and charged back to your account, the Bank reserves the right to charge a returned item fee." *Id.,* Page ID 3310. The Rules & Regulations also included a "Fee Schedule," which listed the fee amounts to be charged for at least twelve different bank services, but it did not include the "returned item fee" mentioned in paragraph 23 of the Rules & Regulations, nor did it list a "deposit adjustment fee" or the amount to be charged for that fee. *Id.*, Page ID 3334. As Newman later learned, the Bank charged a "deposit adjustment fee" if a business customer tendered multiple items for deposit, but totaled the items incorrectly, requiring a bank employee to reconcile the deposit. Between August 2000, when Arlington opened its account, and December 2007, when Arlington filed this lawsuit, the Bank issued revised versions of the Rules & Regulations.

On several occasions beginning in January 2001 and continuing through early 2007, the Bank posted a non-itemized "service charge" on Arlington's monthly account statement and deducted the amount of that charge from Arlington's account. Upon receiving many of these statements, Newman visited the Bank to inquire about the service charge. He learned that a "service charge" is comprised of separate fees. The two most often at issue were the "deposit

4

adjustment fee" and the "returned item fee." Although Newman asked Bank employees to produce documentation confirming that Arlington's business account was subject to a "deposit adjustment fee," the Bank could not present any such writing. On most, if not all, of these occasions, Newman asked the Bank to reverse the service charges, and the Bank did so. According to Newman, the Bank reversed the service charges either because the Bank could not determine what the charges were for or the Bank could not produce any documents to confirm that the fees applied to Arlington's account. The Bank asserts that it waived the service charges as a courtesy to its customer.

In January 2007, the Bank sent Arlington a letter asking it to choose one of three business checking accounts listed in the letter. The Bank indicated its intent to assign Arlington to one of the three accounts starting that month if Arlington did not make a choice. Arlington did not make an election, and the January 2007 statement revealed that the Bank had placed Arlington in a "Business Preferred Checking" account. Newman later changed the account to a "Business Advantage" account and then to a "Business Basics" account. He did not execute any new documents when these changes were made, nor did he receive any documentation relating to the changes to the account.

In June 2007 the Bank revised the Rules & Regulations. The paragraph referring to fees and charges, now paragraph 8 instead of paragraph 9, provided:

> These Rules and Regulations, *as well as fees and charges contained on the Fee Schedule associated with your account(s)* may be altered or amended at any time by the Bank and as altered or amended shall be binding on all Customers after having been made available in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law.

Appellant's App'x, Vol. 1 at 130 (emphasis added). Like the 2000 version of the Rules & Regulations, the 2007 version included a paragraph explaining the "returned item fee." *Id.* at 134,

5

¶ 21.  The 2007 version did not include a "Fee Schedule," but it did have a section entitled, "SPECIAL FEES THAT APPLY TO ALL CONSUMER ACCOUNTS."  *Id.* at 160–61.  Listed there were approximately thirty different fees, including a charge of $10.00 for a "Returned deposited item."  *Id.* at 161.  The list did not include a "deposit adjustment fee."

In August 2007, Arlington received a monthly account statement for July that included a non-itemized "service charge" for $41.00.  As in the past, Newman visited the Bank and asked about the service charge.  The Bank provided Newman with a one-page computer printout showing that the service charge was comprised of two deposit adjustment fees of $8.00 each and two returned item fees of $12.50 each for a total service charge of $41.00.  The Bank charged Arlington $12.50 for each "returned item fee" even though the June 2007 Rules & Regulations in effect at that time stated that the fee was $10.00.  The Bank refused to waive the service charge and also did not produce on Newman's request a document confirming that the fees applied to Arlington's account.

Newman took other steps to try to locate written confirmation of the fees applicable to Arlington's account.  He explored the Bank's website, but found nothing of help there.  He visited several bank branches asking for written confirmation of the fees applicable to Arlington's account, but no documentation was provided.   Newman thus believed that Arlington was entitled to rely on the Rules & Regulations as disclosing the fees that could be charged to Arlington's account.

The Bank charged Arlington another deposit adjustment fee in September 2007, which Newman also challenged.  The Bank refused Newman's request to refund the fee, prompting Arlington to file suit against the Bank in December 2007.

Arlington contends that the Bank deducted fees from its account without ever providing a Fee Schedule, product brochure, or other document to verify that Arlington's account was subject to a deposit adjustment fee or to a returned item fee in excess of the amount stated for that fee in the Rules & Regulations. The only documentation the Bank produced on Newman's request was the August computer printout detailing the composition of the $41.00 fee charged in July, after the charge had already been deducted from Arlington's account.

During discovery, the Bank provided Arlington with a comprehensive list of all fees potentially applicable to Arlington's account. The Bank produced that list by culling data from a mainframe computer that is inaccessible to branch banks. Arlington asserts that the Bank's difficulty in providing the information Newman requested demonstrates that specific fee information is not readily available to business customers.

In support of its summary judgment motion, the Bank produced a variety of evidence, including the testimony of certain bank managers. According to Greg Eiting, Manager of Retail Operations, when the Bank "decides to make a business account fee change, it sends notification of the change to each of its branches at least fifteen days prior to implementation of the fee change so that the representatives at those branches can adequately discuss the fee with the customers impacted by the change." Appellant's App'x. Vol. 2 at 369. William Curry, Enterprise Program Manager, averred that the Bank "always provides information regarding fee changes for business accounts to its financial center branches at least fifteen days prior to that change becoming effective." R. 82-2, Curry Second Decl. ¶¶ 6–7. Further, the Bank "updates its branches on a weekly basis regarding new applicable fees, changes in fee amounts, effective dates of fee changes, and other information concerning changes to business account fees." *Id.* Documents supporting these general statements are notably absent from the summary judgment record.

7

Curry further stated that the "nature and amount of the deposit adjustment fee of $6.00 was made available in the offices of [the Bank] for at least fifteen days before [the Bank] charged Arlington Video that fee," and the Bank increased the amount of that fee from $6.00 to $8.00 in January 2006. "Information regarding this change in the amount of the deposit adjustment fee was made available in the offices of [the Bank] for at least fifteen days before [the Bank] charged Arlington Video the deposit adjustment fee of $8.00." *Id.* ¶ 8. Curry attested that the returned item fee changed from $10.00 to $12.50 in January 2006,[2] and that "[i]nformation regarding this change . . . was made available" in the Bank's offices "for at least fifteen days" before the Bank charged the $12.50 fee to Arlington. *Id.* ¶ 11.

Additionally, the Bank produced testimony that it tailors the notice it gives to customers based on the specific changes being implemented and that its customers are notified of fee changes by various means, including statement inserts, letters, product brochures, signs posted in branch banks, the customer call center, and the internet. According to the Bank, Arlington never utilized the Bank's commercial call center. Further, the Bank's testimony noted that determining which service fees apply to a customer is primarily dependent on the products and services used by that customer and is unique for each customer. A business customer can determine in advance the fees that may be applicable by maintaining a Treasury Management account and negotiating the applicable fees with the Bank.

Newman testified that the Bank did not accurately list the fees applicable to Arlington's account on any Fee Schedule or in any product brochures; that Arlington did not receive any form of written notice about the fees or amendments to fees applicable to its account other than what

---

[2]Curry did not explain why the June 2007 Rules & Regulations listed a returned item fee of $10.00.

was stated in the Rules & Regulations; that every time a service charge was deducted from Arlington's account he was required to visit the Bank to inquire what the charge was for; and that the Bank's employees could not tell him why the fees were charged because they could not figure out which fees were applicable to Arlington's account. Newman points out that the "Business Banking Product Descriptions," which are available to bank employees on the Bank's intranet for use in explaining accounts and fees to bank customers, are very complicated and expressly state that they are "For Internal Use Only," and "Note: Other fees may apply."

James Bingham, the Bank's Senior Manager of Applications Development, testified about the Bank's computer pricing methodology. To do so, he referred to documents printed from the Bank's mainframe computer that are hundreds of pages in length. Other charts in the record confirm the complex nature of the Bank's fee charges. It appears, however, that the Bank is capable of determining the number of Ohio business checking account customers who were charged a non-negotiated deposit adjustment fee since December 2002.

Arlington filed this action in December 2007 in Ohio state court. The Bank removed the lawsuit to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d). In a First Amended Complaint, Arlington asserted individual and class claims for violations of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.02(A)(11), breach of contract and the duty of good faith and fair dealing, and unjust enrichment. Arlington generally alleges that the Bank can charge a business customer fees for services as long as those fees are disclosed in writing to the customer before they are deducted from the account. On the Bank's motion, the district court dismissed all claims with the exception of the breach of contract claim. Following discovery, the court denied Arlington's motion for class certification and, on cross-motions for

summary judgment, the district court entered judgment in favor of the Bank on Arlington's individual claim. Arlington timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II. ANALYSIS

Our first task is to review the grant of summary judgment to the Bank on Arlington's breach of contract claim. We conclude that the district court improperly granted summary judgment in favor of the Bank and against Arlington.

### A. Individual Breach of Contract Claim

#### 1. *Standard of Review*

We examine de novo a district court's grant of summary judgment. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). We consider summary judgment properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The factual evidence, as well as the reasonable inferences drawn from the evidence, are viewed in favor of the nonmoving party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). A genuine issue of material fact exists for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

#### 2. *Breach of Contract Under Ohio Law*

To prevail on a claim for breach of contract under Ohio common law, Arlington must prove the following elements by a preponderance of the evidence: (1) a contract existed, (2) Arlington fulfilled its contractual obligations, (3) the Bank failed to fulfill its contractual obligations, and (4) Arlington incurred damages as a result of the Bank's failure. *See Langfan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009). Construction of a written contract, including the determination of whether the contract's terms are ambiguous, is a question

10

of law for the court, and in making our inquiry we give effect to the intent of the parties in making the contract. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law); *Beasley v. Monoko, Inc.*, 958 N.E.2d 1003, 1011 (Ohio Ct. App. 2011). The parties' intent is presumed to lie in the language they used in their agreement. *Beasley*, 958 N.E.2d at 1011. We must read the contract as a whole and give effect to every part of it, if possible. *See id.*

If the parties dispute the meaning of their contract, the court first considers the four corners of the document to decide if an ambiguity exists. *Id.* at 1012. If the contract terms are clear and precise, the contract is not ambiguous, and the court is not permitted to consider any evidence concerning the parties' intent that is outside the contract itself. *Id.* at 1012. If the parties' intent cannot be discerned from the four corners of the agreement or if the language is susceptible of two or more reasonable interpretations, the meaning of the language is construed against its drafter, and a question of fact must be decided by a jury. *Geczi v. Lifetime Fitness*, 973 N.E.2d 801, 805–06 (Ohio Ct. App. 2012). Contract language can be interpreted by the court on summary judgment if the contract's terms are clear and unambiguous or, if the contract language is ambiguous, the extrinsic evidence supports only one of the conflicting interpretations, notwithstanding the ambiguity. *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004).

One of the disputes in this case centers on the third element of the claim: whether the Bank fulfilled its obligations under the contractual agreement with Arlington.[3] The parties agreed in their contract that the Bank could collect service charges, with Arlington giving the Bank a

---

[3]At oral argument, Arlington conceded that it did not point the district court to any ambiguity in the contract language. As a result, Arlington raises ambiguity for the first time on appeal and that issue is not properly before us. *See United States ex rel. Wall v. Circle C Constr., L.L.C.*, 697 F.3d 345, 357–58 (6th Cir. 2012).

security interest in its business checking account to permit the Bank to withdraw any debt Arlington owed to the Bank. Our inquiry is directed to what the parties' contract required of the Bank with respect to apprising its business customers of the applicability and amount of particular service fees.

The district court focused on whether the Bank breached its contractual obligation to notify Arlington concerning any *changes in fees* because the deposit adjustment fee did not appear on any comprehensive fee list which was made available to or given to Newman. The court concluded that "the Rules and Regulations do not require that a charged fee appear on a 'then current Fifth Third Fee Schedule' or any other compiled list of fees and the Bank is permitted to charge any fee as long as prior notice of the fee is provided in an appropriate manner to the customer. The court further reasoned:

> The language of ¶ 9 of the Rules and Regulations indicates that as long as information concerning the altered or amended rule, regulation, fee or charge was made available in defendant's offices for fifteen days prior to the fee or charge being imposed, or the customer was notified of the amendment or alteration by some other method provided by law, the change in the fee or charge is binding on defendant's account holders.

R. 92, Page ID 3689.

When the district court referred to paragraph 9 of the Rules & Regulations in effect in 2000, the court overlooked an important contractual phrase. Paragraph 9 actually stated that "[t]hese Rules and Regulations, *as well as fees and charges contained on the Fee Schedule*" could be altered or amended as specified in that paragraph. R. 83-1, Page ID 3307 (emphasis added). Paragraph 8 of the Rules & Regulations in effect in 2007 was even more specific, stating that "[t]hese Rules and Regulations, *as well as fees and charges contained on the Fee Schedule associated with your account(s)*" could be altered or amended as provided in that paragraph.

12

Appellant's App'x, Vol. 1 at 130 (emphasis added). The language employed in both of these versions presupposed that the Bank had stated the fees and charges applicable to the account on the "Fee Schedule" before the Bank would take any action to alter or amend those fees and charges by following the procedure set forth in paragraph 9 (2000 version) or paragraph 8 (2007 version). We interpret this unambiguous language to mean that the Bank accepted a contractual obligation to disclose to its customers in writing on a "Fee Schedule" all of the fees and charges "associated with" the account or potentially applicable to the account.

The district court reached its contrary interpretation by disregarding the words, "contained on the Fee Schedule" or "contained on the Fee Schedule associated with your account(s)." The court's approach did not consider the contract as a whole or give effect to every part of it. *See Beasley*, 958 N.E.2d at 1011. Only by omitting the specified contractual phrases could the court reach its conclusion that the Bank could alter, amend, and presumably add fees and charges "so long as the information concerning fees was made available in defendant's offices for fifteen days prior to the imposition of the fees." R. 92, Page ID 3690. This interpretation of the contract was erroneous as a matter of law. *See Savedoff,* 524 F.3d at 763; *Beasley*, 958 N.E.2d at 1011.

The district court then credited the Bank's evidence without considering contrary evidence presented by Arlington. Bank managers testified that the Bank updated its branch offices weekly about new fees, changes in fees, effective dates of fee changes, and similar information; that the Bank "always" provides information to its branches at least fifteen days prior to the effective date of a fee change; and that the Bank tailors the notice it gives to personal and business customers based on the specific changes being implemented by using statement inserts, letters, product brochures, signs posted in branch banks, the customer call center, and the internet.

13

This general testimony lacked specific detail and evidentiary support. As the moving party, the Bank has the burden to identify those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, some of the Bank's evidence related to personal bank accounts, which are governed by the Truth in Savings Act. 12 U.S.C. §§ 4301–4313. That Act, however, does not apply to Arlington's business account. *See* 12 U.S.C. § 4313(1) ("The term 'account' means any account intended for use by and generally used by consumers primarily for personal, family, or household purposes.").

In contradiction to the Bank's evidence, Newman testified that Arlington did not receive any written fee information from the Bank, other than a copy of the Rules & Regulations, *before* fees were assessed to Arlington's account. After the fees were assessed in one non-itemized "service charge," Newman visited a branch bank seeking written information about the composition of the "service charge" and written documentation that the fees applied to Arlington's account, but very little information was provided to him. The only written documentation Newman received was an August 2007 computer printout showing the composition of the $41.00 service charge for July, after the amount had already been deducted from Arlington's account. Newman took other steps to obtain information. He visited other branch banks seeking written confirmation that the fees charged actually applied to Arlington's account, but bank tellers were unable to provide such documentation. He looked at the Bank's internet website, but he did not find any fee information available there.

The district court summarily disregarded Arlington's evidence, reasoning that the Bank's inability to justify the fees *after* they had been assessed was immaterial to the ultimate issue of

14

whether the Bank informed its customers of the fees *before* they were charged. But this analysis misses the precise point Arlington makes. If the Bank possessed written documentation to show business customers all of the potentially applicable fees before those fees were charged, surely the Bank would have produced it to Newman when he inquired or at the very least the Bank would have disclosed it during discovery and provided it to the court to support the Bank managers' declarations.

Similarly, if the Bank "made available in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law" information about anticipated alterations or amendments to fees, it stands to reason that the Bank would have produced that material. The Bank's obvious inability to produce any documentation that it provided to business customers or "made available in the offices of the Bank" before charging fees is circumstantial evidence that no such documentation existed. *See V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 469 (6th Cir. 2012) (observing that V & M Star Steel "produced sufficient circumstantial evidence to justify a jury trial"); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 531 (6th Cir. 2012) (noting that circumstantial evidence is sufficient to survive summary judgment). Only after this lawsuit was filed did the Bank resort to its mainframe computer to produce hundreds of pages of fees potentially applicable to Arlington's business account. Yet, it appears that this information was not accessible to the staff in the branch banks.

The Bank contends that it fulfilled its contractual obligations if it made information about fee alterations or amendments available to staff in the branch banks and not to business customers. This argument disregards the intent of the parties as expressed in their unambiguous contract language. The Rules and Regulations provided that fee alterations and amendments "shall be binding on all Customers *after having been made available* in the offices of the Bank for fifteen

15

(15) days or by such other method as specifically provided by law." The emphasized language evidences the parties' intent to create a notice provision. In other words, the Bank agreed to notify its business customers of contemplated changes to fees fifteen days before the effective date of those changes. Once proper notice of the changes was provided, the customers agreed to be bound by the changes. This language did not obligate Arlington to contact the Bank every fifteen days to inquire whether any new fees or fee modifications affecting its account were about to take effect. Rather, the contract placed the obligation on the Bank to give the business customer proper advance notice of any impending fee changes, after which the changes would be binding on the customer.

In summary, we conclude that the critical contract language must be considered in interpreting the agreement between the Bank and Arlington. In our interpretation of the contract, we consider all of the evidence presented and draw all reasonable factual inferences in favor of Arlington. *See Banks*, 330 F.3d at 892. When we do so, genuine issues of material fact emerge for trial concerning whether the Bank fulfilled its contractual obligation to disclose all fees and charges applicable to business accounts on the "Fee Schedule" associated with the account and whether the Bank provided fifteen days' advance notice to business customers of any anticipated fee alterations or amendments.

*3. The Bank's Defenses*

The Bank contends that Arlington's breach of contract claim is barred by the voluntary payment doctrine and the contractual statute of limitations. We disagree on both counts.

Under Ohio law, money voluntarily paid by one person laboring under a mistake of fact to another person who claims the right to such payment is generally recoverable, but money voluntarily paid as a result of a mistake of law is not. *See State ex rel. Dickman v. Defenbacher*,

16

86 N.E.2d 5, 7 (Ohio 1949) (per curiam); *Consol. Mgmt., Inc. v. Handee Marts, Inc.*, 671 N.E.2d 1304, 1307 (Ohio Ct. App. 1996). "Simply stated, 'a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution.'" *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 894 (S.D. Ohio 2003) (quoting *Randazzo v. Harris Bank Palatine*, 262 F.3d 663, 667 (7th Cir. 2001)).

Viewed most favorably to the non-moving party, the evidence shows that Arlington did not voluntarily pay the Bank the fees with full knowledge of the facts. The Bank did not disclose to Arlington all of the facts relating to the deposit adjustment fee or the increase in the returned item fee before automatically withdrawing those fees from Arlington's account and listing unexplained "service charges" on the monthly bank statements. Newman had to contact the Bank to question the composition and applicability of the "service charges." *Cf. Harris v. ChartOne*, 841 N.E.2d 1028, 1032 (Ill. App. Ct. 2005) (holding plaintiffs voluntarily paid charges listed on invoices where they made no effort to investigate the exact nature of the fees charged). In response to Newman's inquiries, the Bank could not produce any documentation confirming that these fees, in the amounts charged, were applicable to Arlington's account. On this record, the voluntary payment doctrine does not bar Arlington's breach of contract claim as a matter of law. *See Nelson v. Am. Power & Light*, No. 2:08-cv-549, 2010 WL 3219498, *12–14 (S.D. Ohio Aug. 12, 2010).

The Bank points out that Arlington received actual notice of the "deposit adjustment fee" and the proper amount of the "returned item fee" before August 2007 because charges for those fees appeared on Arlington's monthly bank statements. But evidence that a general "service charge" was posted on the bank statements does not necessarily compel a finding that Arlington knew what the charge was for without further investigation. The ultimate issue is whether the

17

Bank honored its contractual obligation as stated in the Rules & Regulations to disclose the fees and any changes to them *before* assessing the fees and whether Arlington had full knowledge of the facts before paying the fees.

Next, the Bank argues that Arlington's suit to recover fees incurred prior to July 2007 is barred by the contractual statute of limitations. Under Ohio law, parties can agree by contract to shorten the applicable statute of limitations if the time limit is reasonable and the contract language is clear and unambiguous. *Angel v. Reed*, 891 N.E.2d 1179, 1181 (Ohio 2008); *R.E. Holland Excavating Co. v. Montgomery Cnty. Bd. of Comm'rs*, 729 N.E.2d 1255, 1259 (Ohio Ct. App. 1999); *Universal Windows & Doors, Inc. v. Eagle Window & Door, Inc.*, 689 N.E.2d 56, 59 (Ohio Ct. App. 1996); *Arcade Co. Ltd. v. Arcade, LLC*, 105 F. App'x 808, 810 (6th Cir. 2004). The Ohio Supreme Court ruled that a clear and unambiguous two-year statute of limitations in an automobile insurance policy was reasonable and enforceable. *Angel*, 891 N.E.2d at 1181. In *R.E. Holland Excavating Company*, the parties agreed that certain claims and disputes between them would be subject to a resolution process governed by specific notice periods, potentially culminating in a sixty-day period to file "a formal proceeding . . . in a forum of competent jurisdiction to exercise such rights or remedies as the appealing party may have with respect to such claim, dispute or other matter in accordance with applicable laws and Regulations." 729 N.E.2d at 1257. The Ohio Court of Appeals upheld that contractual clause as a reasonable reduction in the length of the statutory limitations period. *Id.* at 1259. The same court later held that a dealer agreement providing for a one-year period to file suit for breach of the agreement was a reasonable and enforceable contractual statute of limitations. *Universal Windows & Doors*, 689 N.E.2d at 58–59.

18

In this case, however, the language of the Rules & Regulations does not clearly and unambiguously shorten the Ohio breach-of-contract statute of limitations applicable to Arlington's lawsuit against the Bank. Paragraph 28 of the June 2007 version provided in pertinent part:

> Customer agrees to carefully examine and reconcile account statements. . . . Customer agrees that Bank will not be liable if Customer fails to exercise ordinary care in examining their (sic) statements. Customer will notify Bank of any discrepancy with any item, including, but not limited to, deposits, withdrawals, and checks, within thirty (30) days of the statement mailing or made available to customer date. . . . If notification is not received, Bank will have no liability for such item(s).

The plain language of this provision "neither mentions nor purports to limit any 'action,' 'lawsuit,' or 'demand.'" *Arcade Company Ltd.*, 105 F. App'x at 810. At most this paragraph attempts to release the Bank from liability if its customer fails to exercise ordinary care in examining and reconciling its bank statements and fails to notify the Bank of "any discrepancy with any item" within thirty days. "[U]nder Ohio's case law, something more than this language is required to support a finding that the parties intended to modify the statute of limitations." *Id.* No language like that used in the contracts at issue in *Angel*, *Universal Windows & Doors*, or *R.E. Holland Excavating Company* is found in the Bank's Rules & Regulations. *See id.* at 811. "In the absence of such language, we will not infer an intent to create a contractual limitation period." *Id.* (noting that the finality achieved by a statute of limitations "must be made manifest in clear, unequivocal language.")

Accordingly, the Bank's defenses fail. Summary judgment in favor of the Bank was not warranted on Arlington's individual breach of contract claim.

19

**B.   Class Certification**

The district court denied Arlington's motion to certify a class action, and Arlington now appeals.   Reversal is warranted because the district court premised its decision on an incorrect interpretation of the Bank's contractual obligation to its customers.   Reversal will also provide the district court with an opportunity to consider recent legal developments affecting the class certification issue.

*1.   Standard of Review*

The district court has broad discretion to decide whether to certify a class, and we review its certification determination for an abuse of discretion.   *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013), *cert. denied*, 82 U.S.L.W. 3236 (U.S. Feb. 24, 2014).   "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment."   *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012)).   We will find an abuse of discretion if we reach a firm and definite conviction that the district court committed a clear error of judgment.   *Id.*

*2.   The District Court Will Have the Opportunity to Reconsider Class Certification*

At the time the district court denied class certification, it did not have the benefit of our analysis of the contractual relationship between Arlington and the Bank that is explained in this opinion.   Because the district court misconstrued the Bank's contractual obligation to Arlington under the Bank's own Rules & Regulations, the denial of class certification similarly rested on a misapprehension of the Bank's contractual obligations to its customers.   The district court's error amounts to an abuse of discretion warranting reversal.

20

On remand, the district court will have the opportunity to reconsider Arlington's breach of contract claim and the motion for class certification in light of this opinion and recent developments in class action law. The district court issued its class certification decision in September 2010, nine months before the Supreme Court released its decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). The Supreme Court thereafter issued other important class action decisions, including *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013), and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). Similarly, this court has issued numerous class action decisions since late 2010.

In our prior opinion, we outlined in some detail the reasons why Arlington may be able to satisfy the class action prerequisites of Federal Rule of Civil Procedure 23. This explanation was not intended to certify the class for the first time on appeal, as Arlington clearly acknowledged in its response to the Bank's supplemental briefing. Our intention was to provide guidance to the district court in making its decision on remand. We remand the case to the district court to determine in the first instance whether class certification is appropriate in light of *Comcast Corp.* and other pertinent cases. Because of recent legal developments affecting the case, the district court should grant Arlington leave to amend the motion for class certification and should allow the Bank to file a response to the amended motion.

### III. CONCLUSION

We conclude that the district court erred in granting summary judgment in favor of the Bank on Arlington's individual breach of contract claim. Genuine issues of material fact exist regarding whether the Bank fulfilled its contractual responsibilities. The court misapprehended the Bank's contractual obligations to its customers and this same predicate error led it to deny Arlington's motion to certify a class.

21

Accordingly, in light of our conclusions and the Supreme Court's GVR order, we **REVERSE** the grant of summary judgment in favor of the Bank on Arlington's individual claim and we **REVERSE** the district court's order denying class certification. We **REMAND** the case to the district court for further proceedings, consistent with this opinion. It is the district court's prerogative to decide in the first instance whether Arlington can satisfy the prerequisites of Rule 23. In ruling on the class certification issue, the district court should take into consideration *Comcast Corp. v. Behrend*, *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013), *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and this court's class certification cases.